NARRAGANSETT RACING ASSOCIATION INC. AND WALTER E.
O'HARA *vs.* FRANCIS J. KIERNAN *et al.*

SEPTEMBER 13, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

PER CURIAM. This is a petition for a writ of *certiorari* brought by Narragansett Racing Association, Inc., holder of a class A license issued by the state division of horse racing under the provisions of chapter 2086, public laws 1934, as amended, and by Walter E. O'Hara, president and managing director of said Narragansett Racing Association, Inc., against the respondents, Francis J. Kiernan, chief of the division of horse racing of the state of Rhode Island James H. Hagan, Jr., superintendent of the bureau of licenses, and Thomas F. Kane, superintendent of the bureau of inspection of said division.

The petition seeks to have us review and quash so much of the findings and order, entered by said respondents in their decision of September 3, 1937, as may appear to be illegal. Pursuant to the writ, the respondents have made a return and have brought before us the certified record and papers pertinent to the case. In addition to this record as returned by the respondents, it is agreed, upon suggestion of counsel, that "The rules of Horse Racing adopted by the Rhode Island Division of Horse Racing," as evidenced by a pamphlet, printed and distributed by said division, are a proper part of the record, and that they constitute all the rules, as such, in force at the time of the occurrences in question. The one exception was rule 463, which was promulgated too recently to be printed but which admittedly was in writing and duly served on the licensee, and about which there is no dispute. It was also agreed to incorporate in the record the time of service upon the petitioners of the notice of charges upon which the present action was initiated and the hearing held.

The first part of the order is not in question. The portion sought to be quashed reads as follows: "Second: Said Division finds that said Walter E. O'Hara an employee and official of said Narragansett Racing Association, Inc., on the third day of September, A. D., 1937 did unlawfully interfere with, threaten and intimidate James H. Doorley, a steward appointed by the Division of Horse Racing *in the performance of his duty as a steward* and said Division of Horse Racing hereby orders said Narragansett Racing Association, Inc., a licensee of said Division of Horse Racing, to remove forthwith Walter E. O'Hara as an employee and official of said Narragansett Racing Association, Inc." (italics ours)

The attorney general, appearing for the respondents, during the course of the hearing before us, filed a motion to dismiss the petition "on the ground that it appears on the face of the petition that the petitioners are not entitled to the relief prayed for." While his motion was directed to both petitioners, his argument was directed particularly to the

petitioner Walter E. O'Hara. It was not seriously contended that the other petitioner, Narragansett Racing Association, Inc., was improperly before the court. In fact before us, when pressed, he admitted that, under the broad powers of this court, the petition could be entertained. The charges, hearing and decision by the respondents as the division of horse racing for the state of Rhode Island are directed to Narragansett Racing Association, Inc. and are of vital concern to it. No right of appeal or review is expressly given by the terms of the statute to an aggrieved licensee or party. We are of the opinion that the petition discloses a proper case to entitle the licensee, as an aggrieved party, to bring a petition for the writ of *certiorari* as the only method open to it under existing law by which a review of the action of the division may be obtained. What rights or status the petitioner O'Hara may have as a party to these proceedings, need not be considered, because our ultimate decision on the merits in relation to Narragansett Racing Association, Inc. makes such consideration now immaterial.

It appears that the original notice to the latter petitioner required its appearance for a hearing solely on the charge of an alleged violation of rule 463. This was communicated to the licensee's executive officer several hours before the happening of the incident that forms the basis of the second charge, finding and order in question. Notice of the latter charge was not given in any form to the petitioners until they appeared at the hearing when written copies of both charges were delivered to the petitioner O'Hara and to counsel for the Narragansett Racing Association, Inc. Notwithstanding this form of notice and service, a hearing before the respondents, sitting as the division of horse racing, was held immediately thereafter on the night of September 3, 1937.

The record indicates that counsel appeared for the Narragansett Racing Association, Inc. and not for petitioner O'Hara. As a result of that hearing and the evidence taken thereat, the division of horse racing rendered its decision in

which they found first that the preponderance of evidence did not substantiate the first charge, namely, the alleged violation by the petitioners of rule 463, relating to equal privileges to the press and concerning which we are not now concerned. The second finding and order, which is in question, is as above set forth. This was based upon the second charge, namely, "Said Division of Horse Racing further charges that on, to wit, September 3, 1937, Walter E. O'Hara, an officer of said Narragansett Racing Association, Inc., did unlawfully interfere with, threaten and intimidate James H. Doorley, a steward, appointed by the Division of Horse Racing, in the performance of his duties as a steward."

The attorney general, on behalf of the respondents, has argued that the action of the division in ordering the licensee to remove forthwith the petitioner O'Hara, as an employee and official of said Narragansett Racing Association, Inc., was purely a ministerial act and therefore not reviewable. We cannot agree with this contention, particularly in view of the presence of the words "for cause" in sec. 7 of chap. 2086, public laws 1934, which is admittedly relied on as authority for the division to act. The pertinent part of this section reads as follows: ". . . The commission may at any time *for cause* require the removal of any employee or official employed by any licensee hereunder. . . ." (italics ours)

The petitioners have cited many cases sustaining generally the proposition that the words "for cause" or similar words, in contemplation of law, mean for legally sufficient cause; and that when used in a regulatory statute, as here, such words require some judicial or quasi-judicial action by the body exercising powers under the statute. On the other hand, the attorney general rests substantially on the statement of his contention, although he did cite some cases allegedly in support of it. We have examined these cases and find they are not in point or do not support his contention. To adopt his argument in this respect, it seems, would be to disregard the express language of the statute. The

presence of the words "for cause" indicates clearly to us that the legislature intended that action taken under the provisions of this section requires the division to act in a judicial, or at least in a quasi-judicial, capacity. It is our opinion that the words "for cause" in this section limit the power of the division to order removal of an employee and official of a licensee and require the presence of substantial grounds, established by legally sufficient evidence, in order to support such action.

Unless there is in the record such grounds and evidence to support the decision, the action of the division in making the finding and order of removal upon the charge and hearing in question is without jurisdiction and is not to be sustained. See *McCarthy* v. *Board of Aldermen, Central Falls,* 38 R. I. 385; *Fainardi* v. *Dunn, Justice,* 46 R. I. 344; *Hanna* v. *Board of Aldermen, Pawtucket,* 54 R. I. 392.

While the petitioners have made several other contentions relating to the qualifications of the chief of the division to sit in judgment under the circumstances, and others relating to the alleged illegalities of the order, they are not here considered in view of our ultimate decision being based upon the lack of legally sufficient evidence to prove the charge as made. In making our examination of the evidence, upon which the finding was based, we have, without deciding the point, assumed for the purposes of this opinion that the chief of the division alone had power to make rules and issue orders for the division without any cooperation of the other members who were sitting as the division at this hearing.

The incident which is the basis of the second charge occured on the afternoon of September 3, 1937, some time after the fourth or fifth race, and related to two incidents. The first of these occurred on Tuesday, August 31st and the second on the following Friday. On Tuesday, the chief of the division, *acting alone,* gave certain oral instructions to one of the placing judges in the presence of state steward Doorley. The exact terms of this instruction do not appear

clearly in the record. As stated by the latter, in the transcript, it was that the placing judges were "not to put any numbers up when they called for a photographic finish of any race." At that time there was in force racing rule 121, approved and promulgated by the division of horse racing itself. That rule reads as follows: "The Placing Judges shall occupy the Placing Judges' Stand at the time the horses pass the winning post, and their duty shall be to place as many horses as they think proper in the order of their finish. *They shall announce their decision immediately,* unless they consider it advisable to consult a picture from the finish camera in use at the meeting. When the judges differ in their placing the majority shall prevail." (italics our)

Three days later, on Friday, state steward Doorley went to the judges' stand and called their attention to their alleged failure to conform to the oral instructions previously given to a placing judge by the chief of the division. As stated, the testimony shows that this incident was some time after the fourth or fifth race. Following the visit of Doorley to the placing judges and his reiteration to them of the oral instructions previously given, one of the placing judges notified the petitioner O'Hara of Doorley's message. O'Hara then said: "Go ahead back, I'll be down after this race." After that race, O'Hara went to the stewards' stand. It is uncontradicted in the record that, prior to the incident of Friday, September 3, neither the chief of the division nor state steward Doorley made any attempt to notify, nor did they give any notice, written or oral, of this oral instruction, or of any modification of rule 121, to either of the other two stewards or to the licensee or any officer thereof.

When O'Hara went at this time to the stewards' stand, he met Doorley and the conversation between Doorley and O'Hara, which is the sole basis of the charge, finding and order in question, took place. According to the testimony in the transcript, this conversation appears unquestionably to be related to an altercation between Doorley and O'Hara

during which personal remarks were exchanged concerning each other, and certain other personal remarks were allegedly made by O'Hara concerning the chief of the division.

There was no evidence that O'Hara thereby *unlawfully* interfered, threatened or intimidated Doorley *in the performance of his duty as a steward.* There was no evidence of interference with the giving of any proper messages to the judges, because Doorley already conveyed his message to them before he met O'Hara. The other evidence of alleged threats and intimidation were unquestionably personal and related to no duty being performed by Doorley as a steward. The testimony clearly shows that the altercation and remarks did not relate to any future conduct of the placing judges or of Doorley, but merely referred to conduct of the chief of the division and of steward Doorley in having given instructions to officials and employees of the licensee, without giving previous notice to the managing director of the race track.

It is uncontradicted in the record that Doorley, as state steward, had no greater powers as a steward under the rules adopted by the division of horse racing and under the law, than either of the other two stewards. In fact, he was not the chief steward. The duties of stewards are set forth in rules 72 to 88, inclusive, of the rules of horse racing adopted by the Rhode Island Division of Horse Racing. Among these are the following: "76. The *Stewards* shall have the power to determine all questions arising with reference to entries and racing, subject to the rights of appeal set forth in these rules.

"77. *All questions* pertaining directly to racing which arise during the period of the meeting *shall be determined by a majority vote of the Stewards,* but should they be unable to reach a majority decision within three (3) days, the case shall be reported to the State Racing Division for such action as it deems proper.

"84 The *Stewards* shall have the power to vary any arrangement of the meeting or its conduct, subject to the approval of the State Racing Division.

"87 If any case occurs which is not or which is alleged not to be provided for by these rules, it shall be determined by the *Stewards* in such manner as they think just and comfortable to the usages of the turf." (italics ours)

The record discloses that none of the above rules were modified in any way and all were in effect at the time of the incident in question. No rule or provision of law has been pointed out to us, and we have found none, which would give to the state steward alone the right to order modifications in the rules or conduct of racing, unless he were delegated by previous suitable action on the part of the stewards as a body under the law and rules in force. The complications that would result if one steward could orally transmit to one placing judge what the former considers an oral instruction from the chief of the division of horse racing, which instruction would materially modify a rule that had been previously adopted and followed and was still in effect, are too obvious and serious to need exposition. In our opinion, justice requires that, if the licensee is to be held responsible for the violation by any of its employees or officials of any established rule, then previous notice of that rule must have been given to the licensee. In our opinion, there is nothing in the record which properly connects the evidence of the incident in question with the state steward *in the performance of his duties as a steward,* in accordance with the law and racing rules that were in force on Friday, September 3, 1937, at the time of its occurrence. Without such evidence in the record, the finding and order of removal based thereon are not supported by legally competent evidence.

For the reasons stated, the prayer of the petition is granted, and the finding and record of the respondents embodied in their order of September 3, 1937, as follows: "Second: Said Division finds that said Walter E. O'Hara, an

employee and official of said Narragansett Racing Association, Inc. on the third day of September A. D., 1937 did unlawfully interfere with, threaten and intimidate James H. Doorley, a steward appointed by the Division of Horse Racing in the performance of his duty as a steward and said Division of Horse Racing hereby orders said Narragansett Racing Association, Inc., a licensee of said Division of Horse Racing, to remove forthwith Walter E. O'Hara as an employee and official of said Narragansett Racing Association, Inc." are hereby quashed.

*Hogan & Hogan* for Walter E. O'Hara.

*Raymond J. McMahon* for Narragansett Racing Association, Inc.

*John P. Hartigan,* Attorney General, for respondents.